IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| **TREY ADKINS** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 1:12cv00034 |
| | ) **REPORT AND** |
| | ) **RECOMMENDATION** |
| v. | ) |
| | ) |
| **MARCUS MCCLANAHAN** | ) |
| | ) |
| Defendant. | ) |
| | ) |

This matter is before the undersigned on the defendant's Motion To Dismiss And Memorandum Of Law In Support Of Motion To Dismiss, (Docket Item No. 5), ("Motion"). The plaintiff has responded to the Motion. A hearing was held on the Motion on December 3, 2012. The Motion is before the undersigned magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B). Based on the arguments and representations presented, and for the reasons stated in this Report and Recommendation, the undersigned recommends that the court grant the Motion.

-1-

## I. Facts[1]

The plaintiff, Trey Adkins, was the Democratic candidate for the office of Supervisor for the Knox District of Buchanan County, Virginia, in the November 2011 election. His Republican incumbent opponent was Terry Hall. Hall's brother, Bobby Hall, was a Republican representative on the Buchanan County, Virginia, Electoral Board. Tamara Neo was the Commonwealth's Attorney in Buchanan County, Virginia, running for reelection as the Republican candidate at that time. Neo had been disqualified in her capacity as the Commonwealth's Attorney from prosecuting matters concerning Adkins.[2] At all relevant times, Defendant McClanahan was an investigator with the Virginia State Police.

Adkins was, and remains, engaged in the business of excavation and construction. Beginning in the Spring of 2011, Sheila Dellinger stored a bulldozer at Adkins's place of business, with the understanding that Adkins would purchase the bulldozer if Dellinger was unable to secure another buyer. In early July 2011, Terry Hall informed Dellinger that Adkins was using the bulldozer on a county job at Poplar Gap for which he was being paid a lot of money. Nonetheless, Dellinger took no action based on those statements. On July 19, 2011, Neo, via her Facebook reelection page, asked Dellinger: "Sheila, [s]omeone told me you have an excavator that you loaned and the borrower will not return it. Any truth to that?" Dellinger responded to Neo that Adkins was "supposed to be storing it, but I hear that he has been using it on Poplar Gap and also used it in Ky when they had that

---

[1] Since this matter is before the court on a motion to dismiss based on the pleading, the facts set forth are taken from the Complaint.

[2] Although the court does not know why this is the case, both parties concede that this, in fact, is so.

big flood a few months back. I've been waiting on him to buy it but haven't heard from him. Have been told he c[a]n't buy it, I don't know." When Neo asked Dellinger whether she had given Adkins permission to use the bulldozer during the "storage" time, Dellinger responded "He took it to store it. I didn't give him permission to use it. That's why I was so surprised when 2 different men called me here and said he was using it. One man was a Hall man from Hurley told me, he said 'he's making money off it while you are paying for it.' PLEASE, PLEASE don't get him involved. Oh, and he said 'I write the checks to him for the use of it on the Poplar Gap.'" Later, on July 21, 2011, Neo again wrote to Dellinger via Neo's Facebook reelection page stating: "got the info and Marcus will be visiting you soon, if he hasn't already."

Neo sent McClanahan to interview Dellinger on July 19, 2011. Dellinger told McClanahan that Terry Hall had informed her that Adkins had used the bulldozer on a job in Buchanan County on Poplar Gap and that Hall had written checks to Adkins for that work. Although McClanahan's interview notes state that Dellinger said she wanted to make a criminal complaint against Adkins and that she requested McClanahan to "tow" the bulldozer if he came across it being used, Dellinger now denies she made those statements to McClanahan.

Adkins alleges that, at some time after Dellinger's interview, McClanahan interviewed Buchanan County officials who informed him that Adkins had not used the bulldozer for work on Poplar Gap or other county projects as alleged by Terry Hall. On August 22, 2011, Adkins purchased the bulldozer from Dellinger. In September 2011, Adkins placed the bulldozer at Jackson Chapel Church in Pawpaw, Virginia, in Buchanan County, to make repairs to the road leading into the church. The bulldozer carried signs visible to the public soliciting votes for

Adkins in the upcoming election.  On September 12, 2011, McClanahan, acting in his capacity as a Virginia State Police investigator, arrived at the Jackson Chapel Church and seized the bulldozer without a warrant.  Adkins alleges that, while at the church premises, McClanahan informed representatives of the church that Adkins had stolen the bulldozer.  Adkins further alleges that, at the time of the seizure, one or more of the Halls and/or allies of the Halls were present taking photographs and making phone calls throughout the county spreading the word that Adkins had been arrested.

Adkins filed this action against McClanahan alleging violations of his First, Fourth and Fifth Amendment rights.[3]  More specifically, he alleges that McClanahan's warrantless seizure of the bulldozer without probable cause violated his right to be secure in his property and violated his right to due process.  He also alleges that the seizure, in conjunction with Adkins's political opponents, was done in an effort to violate his First Amendment rights to free speech and political association, utilizing the power of the state to unlawfully and wrongfully interfere with his political campaign.

## II. Analysis

McClanahan argues that Adkins's claims should be dismissed under Federal Rules of Civil Procedure Rule 12(b)(6).  Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atl. Corp. v. Twombly*, the Supreme Court stated that "a

---

[3] In the Plaintiff's Memorandum In Opposition To The Defendant's Motion To Dismiss, (Docket Item No. 10), counsel for Adkins stated that Adkins intended to take a voluntary nonsuit of the Fifth Amendment claim.  This intention was reiterated at the December 3, 2012, hearing.

-4-

plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). Additionally, the Court established a "plausibility standard" in which the pleadings must allege enough to make it clear that relief is not merely conceivable but plausible. *See Twombly*, 550 U.S. at 555-63.

The Court further explained the *Twombly* standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. … Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. …
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

(Internal citations omitted).

Thus, for the purpose of ruling on the Motion, this court will assume that all well-pleaded factual allegations contained in the plaintiff's Complaint are true.

-5-

McClanahan also asserts that he is protected from Adkins's § 1983 claims by the doctrine of immunity. McClanahan is absolutely immune from suit in his official capacity for monetary damages pursuant to § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that state officials sued in their official capacities are not "persons" within the meaning of § 1983). Thus, to the extent that Adkins seeks to sue McClanahan in his official capacity for monetary damages pursuant to § 1983, I recommend that the court dismiss such claims. Both the Supreme Court and the Fourth Circuit have held that state officials sued in their individual capacities are "persons" within the meaning of § 1983 and are not absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991); *White v. Gregory*, 1 F.3d 267, 269-70 (4th Cir. 1993). Nonetheless, government officials may enjoy qualified immunity from civil liability in their individual capacities.

Qualified immunity may be raised in a motion to dismiss. *See Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997); *see also Behrens v. Pelletier*, 516 U.S. 299, 306-07 (1996). Qualified immunity "shields government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Short v. Smoot*, 436 F.3d 422, 426 (4th Cir. 2006) ("Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'")). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

-6-

Case 1:12-cv-00034-JPJ-PMS   Document 17   Filed 02/06/13   Page 6 of 20   Pageid#: 61

A claim of qualified immunity is evaluated using a three-step analysis. First, the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).[4] Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips J., concurring). A right is clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State . . . ." *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980). As long as the conduct's unlawfulness is manifest under existing authority, the exact conduct does not need to be specifically proscribed. *See Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Collinson*, 895 F.2d at 998 (Phillips J., concurring).

### A. Fourth Amendment Claim

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The "touchstone of the Fourth Amendment is reasonableness," and bright-line rules are to be eschewed in this area of the law in favor of "the fact-specific nature of the reasonableness inquiry." *Alvarez v. Montgomery County*, 147 F.3d 354, 358 (4th Cir. 1998) (citations omitted). Reasonableness under the

---

[4] In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that the sequential inquiry of *Saucier* is often appropriate, but not mandatory. Instead, the Court held that the judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *See Pearson*, 555 U.S. at 236.

Fourth Amendment is determined "by assessing, on the one hand, the degree to which [the police action] intrudes upon and individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). The inquiry, therefore, is the individual's right to be free from arbitrary government intrusions against society's countervailing interest in preventing or detecting crime and in protecting its law enforcement officers. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

As a general rule, warrantless searches and seizures are per se unreasonable. *See United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010). However, there are "a few specifically established and well-delineated exceptions." *Williams*, 592 F.3d at 521 (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967))). "[U]nder certain circumstances the police may seize evidence in plain view without a warrant." *Williams*, 592 F.3d at 521 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)). Under the plain view exception to the warrant requirement, police may seize evidence in plain view during a lawful search if: (1) the seizing officer is lawfully present at the place from which the evidence can be plainly viewed; (2) the seizing officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent. *See Williams*, 592 F.3d at 521; *United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012) (citing *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997)).

"The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in

-8-

that item is lost; the owner may retain the incidents of title and possession *but not privacy*." *Williams*, 592 F.3d at 521 (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (emphasis added). "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of *privacy*. A seizure of the article, however, would obviously invade the owner's *possessory* interest." *Williams*, 592 F.3d at 521 (quoting *Horton v. California*, 496 U.S. 128, 133-34 (1990)). "Thus, the *mere observation* of an item in plain view during the course of a lawful search does not implicate any Fourth Amendment concerns and therefore does not need to be justified by any exception to the warrant requirement. And its *seizure* is justified by the fact that any ownership or possessory interest in the item is defeated by its illegality." *Williams*, 592 F.3d at 521 (emphasis in original).

In *United States v. Cobler*, 533 F. Supp. 407, 410 (W.D. Va. 1982) (quoting *United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974)), this court explained the first requirement for invocation of the plain view exception as follows: "the officer's presence at the vantage point from which he discovers the evidence in plain view 'must not amount to an unjustifiable intrusion into an area with respect to which [an individual's] expectations of privacy are protected by the [F]ourth [A]mendment.'" It is an essential predicate to any valid warrantless seizure of incriminating evidence that the officer does not violate the Fourth Amendment in arriving at the place from which the evidence can be plainly viewed. As long as this prerequisite is satisfied, it does not matter that the officer who makes the observation may have gone to the spot from which the evidence was seen with the hope of being able to view and seize the evidence, as the Fourth Amendment requires only that the steps preceding the seizure be lawful. *See Williams*, 592 F.3d at 521. In *United States v. Brown*, 129 F.3d 1260 (Table) (4th Cir. Nov. 5, 1997), the Fourth Circuit, albeit in an unpublished opinion, held that

-9-

an officer had a right to approach a private residence not owned by the defendant to question the defendant regarding information he had received from a confidential informant during a drug investigation. The Fourth Circuit held that the officer had a right to be in that location when he viewed drugs there in plain view. *See Brown*, 129 F.3d at *2.

The court must determine whether Adkins had an expectation of privacy at the Jackson Chapel Church property from which McClanahan observed the bulldozer. Based on the facts as alleged, I find that he did not. There is no allegation that Adkins has any ownership or possessory interest in the Jackson Chapel Church property. Also, while it is not clear exactly how McClanahan came to be located on the Jackson Chapel Church property, counsel for McClanahan argued at the hearing that it is a fair inference that he went there following receipt of information that the bulldozer might be located there. No allegation has been made to indicate otherwise. I find that McClanahan had a lawful right to be on the property as part of his investigation regarding the unauthorized use of the bulldozer. For these reasons, and based on the case law above, I find that the first requirement for invocation of the plain view exception, that McClanahan was lawfully present on the Jackson Chapel Church property, has been satisfied.

Next, the Fourth Circuit has held that the second requirement for invocation of the plain view exception, the lawful access requirement, is "intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in plain sight." *Davis*, 690 F.3d at 234 (citing *Horton*, 496 U.S. at 137 n.7) (describing the second requirement and explaining that even if "[i]ncontrovertible testimony of the senses" establishes that an object in plain view is contraband, "the

police may not enter and make a warrantless seizure"); *see also Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (the "lawful right of access" requirement is "meant to guard against warrantless entry onto premises whenever contraband is viewed off the premises in the absence of exigent circumstances;" thus, while "lawfully positioned" "refers to where the officer stands when [he] sees the item," "lawful right of access" refers "to where [he] must be to retrieve the item").

In *Coolidge*, the United States Supreme Court, in discussing the lawful right of access requirement, explained as follows:

> [N]o amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.

403 U.S. at 468 (citations omitted).

Based on the facts as alleged, I also find that McClanahan had a lawful right of access to the bulldozer. As already found above, McClanahan, as part of his investigation into the allegedly unauthorized use of the bulldozer, was lawfully on the Jackson Chapel Church property. The Complaint alleges that the bulldozer was visible to the public. Once lawfully there, McClanahan observed the bulldozer in plain view. Under these circumstances, I find that McClanahan had lawful access to the bulldozer itself.

Lastly, I find that the incriminating nature of the bulldozer was immediately apparent, thereby satisfying the third requirement for invocation of the plain view exception to the warrant requirement. The Fourth Circuit has interpreted this third requirement for invocation of the plain view exception to mean that police must have probable cause to believe that an object is evidence of a crime. *See United States v. Jefferson*, 571 F. Supp. 2d 696, 705 (E.D. Va. 2008) (citing *United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996)). Probable cause to believe that an object is evidence of a crime exists where "the facts and circumstances within [the officer's] knowledge … [are] sufficient in themselves to warrant a man of reasonable caution in the belief" that the object is evidence of a crime. *Jefferson*, 571 F. Supp. 2d at 705 (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). Complete certainty is not required. Stated another way, "[i]t merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' … that certain items may be contraband … or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *United States v. Farmer*, 914 F.2d 249, at *2 (Table) (4th Cir. Sept. 19, 1990) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)) (citations omitted).

In deciding whether a man of reasonable caution would have believed that the bulldozer was contraband, the court must consider the facts available to McClanahan at the time of the seizure. According to the undisputed facts alleged in the Complaint, Dellinger had said that she did not give Adkins permission to use the bulldozer while he stored it. Adkins admits that the bulldozer was being used to repair a road leading to the church. It is a reasonable inference that McClanahan could observe this once he was present on the property. Based on these facts, I find that McClanahan had probable cause to believe that the bulldozer was

-12-

contraband in that it was being used without the owner's permission. Consequently, I find that the incriminating nature of the bulldozer was immediately apparent to McClanahan, thereby satisfying the third requirement for invocation of the plain view exception to the Fourth Amendment's warrant requirement.

Adkins argues that McClanahan lacked probable cause to seize the bulldozer because the information received during Dellinger's interview was stale, as almost two months had elapsed between the time of the interview and the seizure, because McClanahan did not inform Dellinger that the information she received from Hall that Adkins was using the bulldozer on a county project at Poplar Gap was false and because McClanahan did not interview Adkins. I find that McClanahan, as a Virginia State Police investigator, had discretion to conduct his investigation into the allegedly unauthorized use of the bulldozer in the manner he saw fit. *See Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991) (holding that a police officer is not required to "resolve every doubt about a suspect's guilt before probable cause is established."); *see also Clipper v. Takoma Park, Maryland*, 876 F.2d 17, 20 (4th Cir. 1989) (police officer's failure to pursue potentially exculpatory evidence was not, in itself, sufficient to negate probable cause); *Savage v. County of Stafford, Virginia*, 754 F. Supp. 2d 809, 816 (E.D. Va. 2010) ("the Court is wary of second-guessing the investigatory decisions of an experienced police officer"). Additionally, I find that the falsity of Hall's statement that Adkins was using the bulldozer at Poplar Gap did not negate Dellinger's statement that she did not give permission to Adkins to use the bulldozer.

-13-

As the court has found that McClanahan had probable cause to seize the bulldozer, there was no violation of Adkins's Fourth Amendment rights. That being the case, I further find that McClanahan is entitled to qualified immunity on Adkins's Fourth Amendment claim, and I recommend that the court grant McClanahan's Motion on this ground.

### B. *First Amendment Claim*

Adkins also argues that McClanahan's seizure of the bulldozer was in retaliation for the exercise of his First Amendment rights. A First Amendment retaliation claim requires a plaintiff to show: (1) the plaintiff's speech was protected; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) a causal relationship existed between the plaintiff's speech and the defendant's retaliatory action. *Tobey v. Jones*, ___ F.3d ___, 2013 WL 286226, at *5 (4th Cir. Jan. 25, 2013) (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000)). In *Adams v. Rice*, the Fourth Circuit held that a plaintiff must allege either that the retaliatory action was taken in response to the exercise of a constitutionally protected right or that the retaliatory action itself violated such a right. *See* 40 F.3d 72, 75 (4th Cir. 1994).

The Fourth Circuit has held that in order to show that the alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech, it is insufficient to show that a defendant's conduct caused a mere inconvenience. *See ACLU v. Wicomico County, Maryland*, 999 F.2d 780, 785 (4th Cir. 1993). The appropriate inquiry is whether the speech of a person of reasonable firmness in the plaintiff's situation would have been chilled. *See Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006). In *Blankenship*, the Fourth Circuit stated as follows:

"we undertake an objective inquiry into whether a similarly situated person of ordinary firmness reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." 471 F.3d at 530 (internal quotations omitted). In doing so, the court must "focus [] on the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Blankenship*, 471 F.3d at 530 (quoting *Suarez,* 202 F.3d at 686). A chill is likely when the state actor has "'engaged the punitive machinery of the government in order to punish'" an individual for speaking out. *Blankenship*, 471 F.3d at 531 (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)).

Lastly, a plaintiff must show a causal relationship between the protected speech and the defendant's retaliatory action. The Fourth Circuit has held that "[t]he causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation." *Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990). Instead, the plaintiff must show that "but for" the protected speech, the alleged retaliatory conduct would not have occurred. *See Huang*, 902 F.2d at 1140.

Adkins correctly argues that running for public office, and the speech connected therewith, is protected under the First Amendment, and McClanahan does not dispute that this is the case. *See Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir. 1981). Thus, the first requirement to state a First Amendment retaliation claim has been met by Adkins. I find, however, that Adkins has not alleged facts sufficient to show that McClanahan's act of seizing the bulldozer in September 2011 adversely impacted his 2011 bid for elected office. First, although the court recognizes that the appropriate standard is an objective one, it undoubtedly is

relevant that Adkins has not alleged that McClanahan's seizure of the bulldozer caused him to alter his campaign activities in any way. Additionally, I find it relevant that Adkins ultimately won the election, becoming the Supervisor for the Knox District in Buchanan County. Moreover, I find that a person of "ordinary firmness" would not have altered his campaign strategy based on such actions. This seizure appears to have been an isolated incident. There is no allegation that any actions were taken by McClanahan either prior or subsequent to the seizure of the bulldozer in an alleged effort to injure Adkins's campaign bid or to prevent him from campaigning. While Adkins alleges that McClanahan was involved in a conspiracy with Neo and at least one of the Halls, and possibly both of them, Adkins fails to allege any facts under which it would be plausible that McClanahan was involved in such a conspiracy.

In order to successfully plead a civil conspiracy under § 1983, Adkins must allege facts showing that McClanahan, Neo and the Halls acted jointly in concert and that some overt act was done in furtherance of the conspiracy that resulted in the deprivation of his constitutional rights. *See Hinkle v. City of Clarksburg, West Virginia*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)). Adkins carries a "weighty burden to establish a civil rights conspiracy." *Hinkle*, 81 F.3d at 421. In the absence of direct evidence, he must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. *See Hinkle*, 81 F.3d at 421 (citing *Hafner*, 983 F.2d at 576-77); *see also Abercrombie v. City of Catoosa, Oklahoma,* 896 F.2d 1228, 1230-31 (10th Cir. 1990); *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). Here, I find that Adkins has failed to allege specific circumstantial evidence that McClanahan shared the same, or any, conspiratorial objective with Neo and the Halls. All that the alleged facts before the court show,

as stated herein, is that McClanahan was performing his duties as a Virginia State Police investigator at the request of the Commonwealth's Attorney. There simply are no facts alleged to support the allegation that McClanahan's seizure of the bulldozer was an act in furtherance of a shared conspiratorial objective with Neo and the Halls to injure Adkins's campaign bid. Just as the court stated in *Hinkle*, I find that this is nothing more than "rank speculation and conjecture." 81 F.3d at 422. The only fact Adkins has alleged regarding McClanahan's involvement in a conspiracy is the seizure of the bulldozer itself. However, based on the facts alleged in the Complaint, I have found that McClanahan had probable cause to seize the bulldozer. Given these circumstances, the court cannot find that McClanahan shared a conspiratorial objective with Neo and the Halls to injure Adkins's 2011 campaign bid. Thus, the court will focus its attention on the actions of McClanahan only in determining whether a person of ordinary firmness would have been chilled in his freedom of speech thereby.

Even viewing the facts in the light most favorable to Adkins, I find that a person of ordinary firmness would not have been chilled by McClanahan's actions. McClanahan interviewed Dellinger at Neo's request as part of an investigation regarding the potential unauthorized use of the bulldozer. McClanahan's interview notes reflect that Dellinger told him that she intended to file a criminal complaint against Adkins and that she wanted McClanahan to "tow" the bulldozer if he observed it being used. While the Complaint alleges that Dellinger denies making these statements, the Complaint admits that Dellinger told Neo that she had not given Adkins permission to use the bulldozer. McClanahan went to the Jackson Chapel Church property where he determined that the bulldozer was being used by Adkins. Therefore, he seized the bulldozer. Given these circumstances, I find that the actions of a person of ordinary firmness would not be chilled, as it appears that

-17-

McClanahan was doing nothing more than performing his job duties as a Virginia State Police investigator.

Lastly, even if the facts alleged by Adkins showed that McClanahan's seizure of the bulldozer would have impacted the speech of a person of ordinary firmness, Adkins still cannot show that, "but for" his candidacy for Supervisor, the bulldozer would not have been seized. Again, I have found that the facts as alleged set forth adequate probable cause for the seizure of the bulldozer by McClanahan. That being the case, it cannot be shown that the only reason it was seized was for retaliation for Adkins's exercise of his First Amendment rights.

All of this being said, I find that there was no violation of Adkins's First Amendment rights. That being the case, I further find that McClanahan is entitled to qualified immunity on Adkins's First Amendment claim, and I recommend that the court grant McClanahan's Motion on this ground.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. McClanahan is immune from suit under § 1983 in his official capacity for monetary damages;

2. The court should grant the Motion to Dismiss on claims against him under § 1983 in his official capacity;

3. Adkins had no expectation of privacy at the Jackson Chapel Church property;

4. McClanahan had a lawful right to be on the Jackson Chapel Church property;

5. McClanahan had a lawful right of access to the bulldozer once he was lawfully on the Jackson Chapel Church property;

6. McClanahan had probable cause to believe the bulldozer was contraband;

7. The plain view exception to the Fourth Amendment's warrant requirement allowed McClanahan to seize the bulldozer without a warrant;

8. Taking the well-pleaded facts as true, McClanahan's actions did not violate the Fourth Amendment;

9. McClanahan is entitled to qualified immunity on Adkins's Fourth Amendment claim;

10. Running for public office, and the speech connected therewith, is protected under the First Amendment;

11. McClanahan's seizure of the bulldozer would not have caused a person of ordinary firmness to have altered his campaign activities;

12. Adkins has not alleged facts to show that, but for his candidacy for Supervisor, the bulldozer would not have been seized;

13. Taking the well-pleaded facts as true, McClanahan's actions did not violate Adkins's First Amendment rights; and

14. Officer McClanahan is entitled to qualified immunity on Adkins's First Amendment claim.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the defendant's Motion to Dismiss.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 6th day of February, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE