# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **TREY ADKINS,** | ) | |
| Plaintiff, | ) ) | Case No. 1:12CV00034 |
| v. | ) ) | **OPINION AND ORDER** |
| **MARCUS McCLANAHAN,** | ) ) ) | By: James P. Jones<br>United States District Judge |
| Defendant. | ) | |

*Michael A. Bragg, Bragg Law, Abingdon, Virginia, for Plaintiff; John D. Gilbody and Katherine DeCoster, Assistant Attorneys General, Office of the Attorney General of Virginia, Richmond and Abingdon, Virginia, for Defendant.*

In this action arising under 42 U.S.C.A. § 1983 (West 2012), the plaintiff sought money damages against the defendant, a police officer, who had seized the plaintiff's bulldozer without a warrant or probable cause. The jury found that the officer had violated the plaintiff's constitutional rights, but awarded the plaintiff only nominal damages. The plaintiff has now filed a motion to amend the judgment or, in the alternative, for a new trial. Because defense counsel likely led the jury to believe that the officer would be required to personally pay any judgment in the case, I will grant the plaintiff's motion and afford him a new trial limited to the issue of damages.

I

The underlying facts of this case are set forth more fully in a previous opinion of the court. *Adkins v. McClanahan*, No. 1:12CV00034, 2013 WL 2945022 (W.D. Va. June 14, 2013). The plaintiff Trey Adkins claimed, and the jury found, that the defendant Marcus McClanahan, a state police investigator, had unlawfully seized Adkins' bulldozer and had it towed away from a job site. Adkins was at the time a candidate for local public office and there was evidence that a political opponent had instigated the seizure. Adkins testified at trial that he had been embarrassed and humiliated by the seizure because it wrongfully associated him with criminal conduct and was widely disseminated in the ongoing political campaign.

At the close of defense counsel's lengthy cross examination of Adkins at trial, the attorney inquired as follows:

> BY MR. GILBODY [Defense Counsel]:
>
> Q: You know Special Agent McClanahan has a family, correct?
>
> A: That's correct.
>
> Q: And earlier in your testimony you indicated you asked yourself quite often what would Jesus do. Do you remember that testimony?
>
> A: I do.[1]

---

[1] Adkins had been using his bulldozer when it was seized to fix a road for a local church as a donation. He testified that he had been afraid that because he was running for office, he might be accused of doing this solely for political purposes. He had asked

Q: Did you ask that question before you sued him for $500,000?

A: Huh?

Q: No more questions.

    THE WITNESS: May I answer, Your Honor?

    THE COURT: Yes, sir, you may.

    MR. BRAGG [Plaintiff's Counsel]: I would ask if counsel doesn't want an answer to that question, he withdraw it.

    MR. GILBODY: I'll withdraw it.

(Trial Tr. 2, July 30, 2013.)

The jury was then removed, and the following colloquy occurred:

    THE COURT: I'm concerned, counsel, about the last question that was asked in front of the jury but withdrawn. Counsel, Mr. Gilbody, would Mr. McClanahan have to pay any part of any judgment entered in this case?

    MR. GILBODY: I don't believe so, Your Honor.

    THE COURT: And so you indicated then to the jury, falsely, that Mr. McClanahan would have to pay any judgment; that his family would be injured in some way by any judgment that the jury — excuse me — any verdict that the judge entered in this case.

    MR. GILBODY: Well, Your Honor, respectfully, I think that wasn't the point I was trying to make. The point I was trying to make was that the witness invoked his faith on numerous occasions, and it seems to, to be, his actions seem to be quite at odds with his profession

---

himself, "What would Jesus do," and decided to go ahead and help the church.

-3-

of his faith, and I wasn't, I made no statement about, you know, how this would impact his family —

THE COURT: You asked the witness if he knew that Officer McClanahan had a family. Yes, he did. And then you went into the what would Jesus do, and you asked him, did you ask that question before you sued him for $500,000? What's the reasonable implication of all that to the jury, that the plaintiff is attempting to harm Mr. McClanahan and his family, personally. Now, I think this is a serious matter, and counsel needs to consider what I'm going to tell the jury about this. I think they need some proper instruction from the court about that, and I'm going to think about that, and counsel needs to think about it, too.

MR. GILBODY: Your Honor, my point was, the point that I was trying to make was solely relating to the way I felt he was being, his actions were at odds with his professions of faith.

THE COURT: Why is that? What possible implication would there be to file a lawsuit to protect one's, or vindicate one's civil rights that would be contrary to some teaching of religion? Unless it was to harm somebody personally and their family, you know, hard working police officer whose family would be harmed by some immense judgment that, of course, we know that he's not going to pay individually at all.

MR. GILBODY: Well, a couple of issues there. First of all, Your Honor, and if Your Honor is inclined to go down — this is going to be complicated. First of all, the, the question goes to what the plaintiff was thinking at the time of filing of the lawsuit, not who's actually going to pay. That's the point of the question.

I would assume that he would have no knowledge about who would be paying, but I don't know the answer to that question. The point, though, becomes, and to address your other issue as to the testimony, was he made a bad decision that day, and how does that implicate religious, you know — I mean, as a Christian I can say someone makes a bad decision on one day, which is the way it was put

-4-

by the plaintiff, is that's the whole issue in the case, well then the very basic tenet of Christianity is forgiveness, so, the point would be, most certainly implicates that, that fundamental idea of Christianity, and that's what I was trying to encapsulate in the question, and that's, Your Honor, I understand your point, and it's well taken, and I didn't think of it, I wasn't, and I don't mean to be, I'm not trying to be cute, Your Honor, I assure you, that wasn't my point, to try to, I mean, I wasn't trying to look at it, I wasn't trying to focus the jury on what was going to happen to Special Agent McClanahan, but rather what was going through the plaintiff's mind at the time, and that was the focus of the question, and that's what I was trying to elicit.

THE COURT: All right, Mr. Gilbody. Well, I'm just telling counsel that I'm going to think about what the remedy here is, if there is one. And Mr. Bragg, anything you want to say?

MR. BRAGG: Yes, Your Honor. Not only was the substantially improper question asked, but I think it was done in the context of knowing it was an improper question because he walked away and said thank you before he was given an opportunity to answer. That's the reason I made that immediate objection in the presence of the jury. And I would suggest to the court that the, with this, this being put into the testimony, the minimum remedy for that would be to advise the jury that, that Mr. McClanahan, that his family will not be [sic] paid any judgment that the jury imposes.[2]

(*Id.*) I denied the plaintiff's request for that jury instruction but did instruct the jury at the end of the case as follows: "In determining any damages in this case, you should not concern yourself with who may be required to actually pay any such damages. Your verdict as to damages must be based solely on the facts as you find

---

[2] As the context makes clear, plaintiff's counsel meant to say the instruction proposed by him would inform the jury that McClanahan and his family would not pay any judgment that the jury awarded.

-5-

them and the law which I have instructed you about." (Final Jury Instructions, Instruction No. 10, July 30, 2013.)

After deliberations, the jury returned a verdict finding that the defendant had violated the plaintiff's Fourth Amendment right to be free from unreasonable seizures, but awarding damages of only one dollar.[3]

In his present motion, the plaintiff asks me, based upon defense counsel's remark, to either "award him damages commensurate with the proof adduced or, in the alternative, for [sic] a new trial on the issues [sic] of damages." (Mot. to Amend J. or for a New Trial 3.) Because the determination of damages is within the jury's province, I cannot award damages, but I will grant a new trial on that issue.

II

Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant "a new trial on all or some of the issues" to any party. Fed. R. Civ. P. 59(a). "In considering a motion for a new trial, a trial judge may weigh the evidence and consider the credibility of witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of

---

[3] The jury was instructed without objection that it could award damages based upon proof of inconvenience, embarrassment, humiliation, or injury to reputation suffered by the plaintiff, or in the absence of such proof, could award nominal damages not to exceed one dollar.

justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial." *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010) (internal quotation marks and citations omitted). "The decision to grant or deny a new trial is within the sound discretion of the district court . . . ." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

Federal Rule of Evidence 411 limits the admissibility of "evidence that a person was or was not insured against liability." Fed. R. Evid. 411. Information about insurance may improperly influence the jury's deliberations, conclusion, or award of damages. *See, e.g.*, *Travelers Ins. Co. v. Lobello*, 186 S.E.2d 80, 81 (Va. 1972) (holding that discussion of insurance constituted prejudicial error). For similar reasons, many courts have also limited the admissibility of evidence about indemnification to state officials in § 1983 cases. *See Griffin v. Hilke*, 804 F.2d 1052, 1057 (8th Cir. 1986) ("The general rule in the state courts and under Fed. R. Civ. P. 61 is that interjection of the fact that the defendant is protected by insurance or other indemnity may be prejudicial error requiring reversal."). Conversely, when jurors are given the impression that there is no indemnification, they may improperly consider the financial impact that a judgment would have on a defendant. *See Joseph v. Brierton*, 739 F.2d 1244, 1248 (7th Cir. 1984).

Not every intimation of indemnification or the lack thereof justifies a new trial. Each statement should be viewed "[i]n the context of the entire mosaic" of the case. *Griffin*, 804 F.2d at 1058. The court has the discretion to assess whether a statement compromises a verdict "alone or in combination with other circumstances." *See Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 200 (4th Cir. 1982). Where statements "had the potential, and were undoubtedly intended, improperly to influence the jury on the compensatory damage issue, their possible impact on that issue deserve[s] careful attention." *Id.* at 199. Potential for prejudice is especially great when one party implies a fact that the other party cannot refute or address. *Joseph*, 739 F.2d at 1247. Indeed, implying an untrue fact with knowledge of the other party's constraints suggests that the improper implication was intentional. *Id.*

In the case at hand, defense counsel's statements introduced prejudice into the proceedings. He asked the plaintiff whether he knew the defendant had a family. The defense counsel then asked if the plaintiff remembered asking himself "what would Jesus do?" before deciding to sue the defendant. These questions, asked in succession, likely led jurors to the conclusion that the defendant would himself pay any damages awarded, to the harm of his family. Particularly since defense counsel ended his questioning without waiting for a response, I believe that he intended to create the misimpression that the defendant would pay any damages that the jury

-8-

awarded. Although the jury was instructed by me not to consider who actually paid damages, I find that this was insufficient under the circumstances to correct the misimpression left by counsel's remark, particularly in light of the award of only nominal damages. *See Lawson v. Trowbridge*, 153 F.3d 368, 380 (7th Cir. 1998) (concluding that since the jury assessed only nominal damages against state officers after a finding of liability, the district court's decision not to admit evidence of indemnification was not harmless error).

When a misleading statement or question implies that a defendant will have to pay a judgment out of personal funds, a curative instruction may not be enough. A curative instruction can be problematic if it pushes the issue into the forefront of jurors' minds without correcting any misimpressions. "[T]he efficacy of such an instruction is always uncertain, and where the misconduct giving rise to it is . . . serious . . . stronger medicine may be needed." *Joseph*, 739 F.2d at 1247.

I am always reluctant to interfere with the jury's verdict, in light of its paramount role under our system to determine the facts. Based on the evidence at trial, it was certainly possible for this jury to have found that the plaintiff was only entitled to nominal damages because his evidence of harm was overblown or otherwise not credible. However, when defense counsel improperly (and

intentionally, in my view) put his finger on the scale, I feel it is my duty to correct the miscarriage of justice.

### III

Accordingly, the Motion to Amend Judgment or, in the Alternative, for New Trial (ECF No. 56) is GRANTED IN PART.  The plaintiff is granted a new trial as to damages.

It is so **ORDERED**.

ENTER: September 16, 2013

/s/ JAMES P. JONES
United States District Judge